, AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California



FILED

JUL 0 2 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched <br> or identify the person by name and address)* <br> One Red and Silver, DT101 G2, 8 GB Thumb Drive | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No.

18MJ3802

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A-4

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*
  See Attachment B-4

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 46 U.S.C. §§ 70503(a)(1), 70506(b) | Conspiracy to Possess with Intent to Distribute Cocaine On Board a Vessel Subject to the Jurisdiction of the United States |
| Title 21 U.S.C. §§ 959, 963 | International Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached affidavit of HSI TFO Adriana Rosas-Carranza.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Adriana Rosas-Carranza, HSI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/2/18 _____

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Adriana Rosas-Carranza, being duly sworn, depose and state as follows:

## INTRODUCTION

1.     This affidavit supports an application to search the following target devices:

One SIM card, Movistar - 123401403976462 ("**Target Device 1**") as described in Attachment A-1 and incorporated herein,

One SIM card, Claro – 57101401802974375 ("**Target Device 2**") as described in Attachment A-2 and incorporated herein,

One Conarc Thumb Drive ("**Target Device 3**") as described in Attachment A-3 and incorporated herein,

One Red and Silver, DT101 G2, 8 GB Thumb Drive, ("**Target Device 4**") as described in Attachment A-4 and incorporated herein,

(collectively referred to as "Target Devices") and to seize evidence of crimes as outlined in Attachments B-1 and B-4, and incorporated herein, specifically Title 46 U.S.C. §§ 70503(a)(1), 70506(b)[1], Conspiracy to Possess with Intent to Distribute Cocaine On Board a Vessel Subject to the Jurisdiction of the United States, and Title 21 U.S.C. §§ 959, 963, Conspiracy to Distribute Controlled Substances for the Purpose of Importation into the United States.

2.     Defendants Victorino Benavidez-Biojo, Leonel Fernando Ortiz-Rivas, Segundo Nemesio Becerra, Jose Trinidad Tapia-Ortiz, and Juan Lopez-Valdez were detained on February 23, 2018, approximately 275 miles southwest of Hualtulco, Mexico on a go-fast vessel by the United States Coast Guard.  The United States Coast Guard

---

[1] Title 46 U.S.C. §§ 70503(a)(1) and 70506(b) prohibits the manufacture, distribution, and possession of controlled substances, and conspiracy to commit the same, on vessels subject to jurisdiction of the United States. A vessel is "subject to the jurisdiction of the United States" if the vessel is without nationality. A vessel without nationality includes any vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

recovered forty-five bales of cocaine that were jettisoned from the go-fast vessel, weighing approximately 1,575 kilograms (3,472.28 pounds). The **Target Devices** were seized from the go-fast vessel and/or defendants. The **Target Devices** are in the custody of Homeland Security Investigations in San Diego, California.

3.      Based on the information below, there is probable cause to believe that a search of **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B-1 and B-4.

## TRAINING AND EXPERIENCE

4.      I am an officer with the Department of Homeland Security, Customs and Border Protection and have been so employed for approximately seventeen years. I have been a Task Force Officer with Homeland Security Investigations for approximately six years. I have conducted criminal investigations of or relating to narcotics smuggling and other crimes. I have received specific training in the area of narcotics investigations, and I have training and experience in the methods used by narcotics traffickers to import and distribute drugs. I am presently assigned to the Organized Drug Enforcement Task Force (OCDETF) Strike Force Group in San Diego, California, and my duties include investigating the illicit trafficking of controlled substances into the United States of America. I am cross designated by the United States Drug Enforcement Administration to conduct narcotics investigations and enforce the provisions of the Federal Controlled Substance Act, pursuant to Title 21, United States Code.

5.      I have received formal training, as well as on-the-job experience and training, relative to the investigation of the importation, transportation, sales, manufacturing and distribution of controlled substances. I have also participated in investigations that involved the use of electronic surveillance techniques. I have investigated illicit narcotic and controlled substances that have resulted in arrests, indictments, trials and convictions. I have interviewed individuals who have been

1  directly and indirectly involved in the importation, transportation, distribution and
2  manufacturing of illegal drugs and controlled substances.

3       6.       Based on my training and experience, I have become familiar with the
4  methods utilized in narcotics trafficking operations and the unique trafficking patterns
5  employed by narcotics organizations.  I have also spoken with senior agents as well as
6  other senior law enforcement officers, about their experiences and the results of their
7  investigations and interviews. I know that drug traffickers often require the use of a
8  communication facility to negotiate times, places, schemes and manners for importing,
9  possessing, concealing, manufacturing and distributing controlled substances and for
10 arranging the disposition of proceeds from the sales of controlled substances. I know that
11 professional drug operations depend upon maintaining their extensive contacts. The
12 communication facility enables drug dealers to maintain contact with drug associates,
13 drug suppliers and drug customers.  I also know that drug traffickers sometimes use
14 fraudulent information, such as nominee names and false addresses, to subscribe to
15 communication facilities, especially emails, cellular phones, messaging apps and
16 frequently use communication facilities to thwart law enforcement efforts to intercept
17 their communications.

18      7.       Based upon my training and experience as a Task Force Officer, and
19 consultations with law enforcement officers experienced in narcotics smuggling
20 investigations, I am also aware that:

21      a.     Drug traffickers will use cellular telephones because they are mobile and
              they have instant access to telephone calls, text, web, and voice messages;
22

23      b.     Drug traffickers will use cellular telephones and GPS devices because they
              are able to actively monitor the progress of their illegal cargo while the
24            conveyance is in transit;

25      c.     Drug traffickers and their accomplices will use cellular telephones and
              GPS devices because they can easily arrange and/or determine what time
26            their illegal cargo will arrive at predetermined locations;

27

28                                              3

d.   Drug traffickers will use cellular telephones and GPS devices to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e.   Drug traffickers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

f.   The use of cellular telephones by drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g.   The use of GPS devices by smugglers tends to generate evidence that is stored on the GPS, including, but not limited to address book entries, search history, user profiles and passwords, location history, routes, contacts, saved addresses–tending to indicate who used or controlled the GPS device, and other digital information.

8.   Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. I also know that GPS devices can and often do contain electronic records and data such as contacts location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones and GPS devices yields evidence:

a.   tending to identify attempts to transport cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the

4

transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in the transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

d.    tending to identify travel to or presence at locations involved in the transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States, such as pickup, transfer, and delivery locations, along with the refueling points throughout the smuggling venture;

e.    tending to identify the user of, or persons with control over or access to, the target device; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

9.    In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking investigations, and the opinions stated here are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. This statement is made in support of an application for a warrant to search **Target Devices** that are believed to contain evidence of violations of Title 46 U.S.C. §§ 70503(a)(1), 70506(b) and Title 21 U.S.C. §§ 959, 963.

10.    Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to federal agents regarding this investigation. Instead, it contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, upon conversations with other Homeland Security Investigations Special Agents, and my personal observations and knowledge. When the contents of documents or statements of

5

1  others are reported herein, they are reported in substance and in part unless otherwise
2  indicated.

3  **FACTS SUPPORTING PROBABLE CAUSE**

4      11.    On February 23, 2018, a U.S. maritime patrol asset (MPA) was conducting
5  routine patrol in the Eastern Pacific ocean, approximately 275 miles southwest of
6  Hualtulco, Oaxaca, Mexico when the aircraft personnel spotted a go-fast vessel (GFV)
7  traveling north at a high rate of speed. The United States Coast Guard (USCG) Cutter
8  Bear (BEAR), which was thirty miles east, diverted to intercept. At twenty miles, from
9  the GFV, USCG BEAR dispatched its Over the Horizon (OTH) vessel and subsequently
10 launched its helicopter. The MPA went overt as the helicopter acquired visual. USCG
11 helicopter personnel turned on the blue law enforcement lights and gave command in
12 English and Spanish. The GFV stopped and was recorded as the occupants jettisoned
13 packages. The GFV then continued at a high rate of speed. The helicopter vectored the
14 OTH vessels to the scene. Upon arrival, the OTH crewman observed approximately
15 twenty bales in the water. The OTH crew retrieved one bale and continued pursuit of the
16 GFV. Helicopter personnel again turned on the blue law enforcement lights and gave
17 commands in English and Spanish but the GFV failed to stop. Precision warning shots
18 were conducted by the helicopter and the GFV stopped. The helicopter moved away and
19 the GFV immediately got back underway. Two additional rounds were fired and the GFV
20 stopped and remained compliant. The OTH caught up to the GFV and observed it was a
21 35 foot panga style vessel, blue hull with multiple fuel barrels on board and two 300 HP
22 Yamaha outboard engines. USCG crewman boarded the GFV, gained control of the GFV
23 and the suspects, and conducted a safety sweep. USCG crewmen arrested the master of
24 the vessel, Victorino Benavidez-Biojo, and crewmembers, Leonel Fernando Ortiz-Rivas,
25 Segundo Nemesio Becerra, Jose Trinidad Tapia-Ortiz, and Juan Lopez-Valdez. The
26 master of the vessel, Victorino Benavidez-Biojo did not provide a claim of nationality for
27 the GFV, and there was no vessel name or registry number for the GFV. The GFV was

28

6

1  then treated as without nationality and a full law enforcement boarding was conducted.

2  USCG crewmen ultimately recovered forty-five bales of cocaine near the jettison area,

3  and the bales were transported to the USCG Cutter BEAR. Two packages were opened

4  and two separate field-tests were performed by USCG personnel. Both field-tested

5  positive for the properties of cocaine. USCG personnel subsequently seized the bales of

6  cocaine, and determined that the forty-five bales had an approximate weight of 1,575

7  kilograms (3,472.28 pounds). The **Target Devices** were seized from the go-fast vessel

8  and/or defendants.

9      12.    Based upon my experience investigating drug traffickers using go-fast

10  vessels and the particular investigation in this case, I believe that Victorino Benavidez-

11  Biojo, Leonel Fernando Ortiz-Rivas, Segundo Nemesio Becerra, Jose Trinidad Tapia-

12  Ortiz, and Juan Lopez-Valdez likely used the **Target Devices** to coordinate the

13  conspiracy to possess with intent to distribute cocaine on board a vessel subject to the

14  jurisdiction of the United States and conspiracy to distribute controlled substances for the

15  purpose of importation into the United States. Based on my investigation of drug

16  importation and distribution conspiracies, telephone contact with smugglers can begin

17  several weeks or months before drugs are loaded into the go-fast vessel, and includes

18  coordination on the pickup, transfer, and delivery locations, along with the refueling

19  points throughout the smuggling venture. I respectfully request permission to search

20  **Target Devices** for data beginning on December 1, 2017, up to and including February

21  23, 2018.

22      13.    I also know that search history, user profiles and passwords, location history,

23  routes, contacts, saved addresses–tending to indicate who used or controlled the

24  cellular/mobile telephone, GPS device, and other digital information are stored in the

25  memory of **Target Devices** which may identify other persons involved in drug trafficking

26  activities. Additional contact information for others possibly involved in the conspiracy

27  to distribute controlled substances can be adduced from **Target Devices**.

28

14.     Based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of Victorino Benavidez-Biojo, Leonel Fernando Ortiz-Rivas, Segundo Nemesio Becerra, Jose Trinidad Tapia-Ortiz, and Juan Lopez-Valdez, such as search history, user profiles and passwords, location history, routes, contacts, saved addresses–tending to indicate who used or controlled the cellular/mobile telephone and/or GPS device, and other digital information are stored in the memory of **Target Devices**.

## METHODOLOGY

15.     It is not possible to determine, merely by knowing the cellular telephone or GPS device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular telephone and GPS service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones and GPS devices do not have hard drives or hard drive equivalents and store information in volatile memory within the devices or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone and GPS models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to

1   such acquisition, the examiner must inspect the device manually and record the process
2   and the results using digital photography. This process is time and labor intensive and
3   may take weeks or longer.

4         16.   Following the issuance of this warrant, I will collect the cellular/mobile
5   telephone and/or GPS device and subject it to analysis. All forensic analysis of the data
6   contained within the cellular/mobile telephone and/or GPS device and their memory
7   cards will employ search protocols directed exclusively to the identification and
8   extraction of data within the scope of this warrant.

9         17.   Based on the foregoing, identifying and extracting data subject to seizure
10  pursuant to this warrant may require a range of data analysis techniques, including manual
11  review, and, consequently, may take weeks or months. The personnel conducting the
12  identification and extraction of data will complete the analysis within ninety (90) days,
13  absent further application to this court.

14                                   **CONCLUSION**

15        18.   Based on all of the facts and circumstances described above, I believe that
16  probable cause exists to conclude that Victorino Benavidez-Biojo, Leonel Fernando
17  Ortiz-Rivas, Segundo Nemesio Becerra, Jose Trinidad Tapia-Ortiz, and Juan Lopez-
18  Valdez used **Target Devices** to facilitate the offense of conspiracy to distribute cocaine.
19  The **Target Devices** was likely used to facilitate the offense by transmitting and storing
20  data, which constitutes evidence of violations of Title 46 U.S.C. §§ 70503(a)(1), 70506(b)
21  and Title 21 U.S.C. §§ 959, 963.

22        19.   Because the **Target Devices** were seized, there is probable cause to believe
23  that evidence of illegal activity related to conspiracy to possess with intent to distribute
24  cocaine on board a vessel subject to the jurisdiction of the United States and conspiracy
25  to distribute controlled substances for the purpose of importation into the United States
26  committed by Victorino Benavidez-Biojo, Leonel Fernando Ortiz-Rivas, Segundo

27

28                                        9

1 | Nemesio Becerra, Jose Trinidad Tapia-Ortiz, and Juan Lopez-Valdez continues to exist
2 | on the **Target Devices**.

3 | 20. WHEREFORE, I request that the court issue a warrant authorizing HSI
4 | Special Agents and/or other federal and state law enforcement officers to search the items
5 | described in Attachments A-1 and A-4, and to seize items listed in Attachments B-1 and
6 | B-4, using the methodology described above.

7 | I swear the foregoing is true and correct to the best of my knowledge and belief.

10 |
Adriana Rosas-Carranza
Task Force Officer
Customs and Border Protection

13 | Subscribed and sworn to before me this _____ day of July, 2018.

16 |
HON. BERNARD G. SKOMAL
17 | United States Magistrate Judge

10

## ATTACHMENT A-4

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 46 U.S.C. §§ 70503(a)(1), 70506(b), Conspiracy to Possess with Intent to Distribute Cocaine On Board a Vessel Subject to the Jurisdiction of the United States, and Title 21 U.S.C. §§ 959, 963, Conspiracy to Distribute Controlled Substances for the Purpose of Importation into the United States is described below:

One Red and Silver, DT101 G2, 8 GB Thumb Drive,

Target Device is currently in the possession of United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

## **ATTACHMENT B-4**

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone and/or GPS device described in Attachment A-1 through A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone and/or GPS device. The seizure and search of the cellular/mobile telephone and/or GPS device will be conducted in accordance with the procedures outlined in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone and/or GPS device will be electronic records, communications, and data such as location data, for the period of December 1, 2017, up to and including February 23, 2018:

a.   tending to identify attempts to transport cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States;

d.   tending to identify travel to or presence at locations involved in the transportation of cocaine or some other controlled substance from South and Central America to Mexico and eventually into the United States, such as pickup, transfer, and delivery locations, along with the refueling points throughout the smuggling venture;

e.   tending to identify the user of, or persons with control over or access to, the target device; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 46 U.S.C. §§ 70503(a)(1), 70506(b) and Title 21 U.S.C. §§ 959, 963.**